ROBBINS GELLER RUDMAN
  & DOWD LLP
TRAVIS E. DOWNS III (148274)
BENNY C. GOODMAN III (211302)
ERIK W. LUEDEKE (249211)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
      – and –
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| CITY OF PONTIAC POLICE AND FIRE RETIREMENT SYSTEM, Derivatively on Behalf of MATTEL, INC., <br><br> Plaintiff, <br><br> vs. <br><br> PRICEWATERHOUSECOOPERS LLP and JOSHUA ABRAHAMS, <br><br> Defendants, <br><br> – and – <br><br> MATTEL, INC., a Delaware corporation, <br><br> Nominal Defendant. | Case No. 2:21-cv-08498 <br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS, PROFESSIONAL MALPRACTICE, GROSS NEGLIGENCE, UNJUST ENRICHMENT AND CONTRIBUTION <br><br><br> DEMAND FOR JURY TRIAL |

**JURISDICTION AND VENUE**

1. This Court has jurisdiction under 28 U.S.C. §1331 because the claims asserted herein arise under §§10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78u-4.  This Court has exclusive subject matter jurisdiction over the federal securities laws claims under §27 of the Exchange Act, 15 U.S.C. §78aa, and supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. §1367.

2. This Court has jurisdiction over each defendant because each defendant is either a partnership or corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District Courts permissible under traditional notions of fair play and substantial justice.

3. Venue is proper in this Court under 28 U.S.C. §1391(a) because: (i) Mattel maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**INTRODUCTION**

4. This is a shareholder derivative action on behalf of nominal defendant Mattel, Inc. ("Mattel" or the "Company") against defendants PricewaterhouseCoopers LLP ("PwC") and Joshua Abrahams ("Abrahams") (together, "defendants") for violations of the federal securities laws, professional malpractice, gross negligence, unjust enrichment and contribution.  At all relevant times, defendants served as Mattel's purportedly independent registered professional accountants.

5.     To Mattel's detriment, defendants breached the faith that Mattel placed in them to audit the Company's financial statements and internal controls independently and professionally.  Instead, defendants unlawfully schemed to issue materially false and misleading unqualified audit reports on Mattel's 2017 and 2018 consolidated financial statements, which contributed to artificially inflating the trading price of Mattel common stock on the open market.  As 2018 and 2019 unfolded, Mattel suffered damages, injuries and losses.  By this action, plaintiff seeks to vindicate Mattel's rights against defendants PwC and Abrahams for their misconduct.

6.     In late 2019, Mattel's Board of Directors (the "Board") determined that defendants PwC's and Abrahams' misconduct had injured the Company.  However, they still have not commenced suit against either.  Instead, the Board has wrongfully refused to timely consider plaintiff's March 3, 2020 Litigation Demand (the "Demand") for Mattel to sue defendants for damages and other relief.

7.     Delaware law requires a board of directors of a Delaware corporation to timely accept or reject a shareholder demand.  Deferring a board of directors' response to a demand – the course chosen by the Mattel Board here – is not a legal option.  The Board's wrongful deferral therefore renders this action ripe for prosecution.

## OVERVIEW OF THE ACTION

**Mattel Falls on Hard Times**

8.     Founded in 1945, Mattel was once one of the world's leading toy manufacturers.  By early 2017, however, the Company's business had fallen on hard times due to shifts in consumer demand towards electronics and on-line entertainment.

9.     For the first quarter of 2017, ended March 31, 2017, Mattel reported an operating loss of $127 million, leading a Barclays' securities analyst to exclaim that "Mattel's 1Q17 results were surprisingly bad."  For the second quarter of 2017, ended June 30, 2017, Mattel continued to disappoint as it missed revenue, gross margin and earnings expectations.

10.     In September 2017, as rumors of Toys "R" Us' impending bankruptcy swirled, securities analysts issued more negative reports on Mattel.  For example, on September 20, 2017, Barclays reported that "[g]iven the potential for lost cash flow, we believe the Toys R Us bankruptcy filing could be particularly negative for MAT."

11.     Worse yet, on October 26, 2017, Mattel announced that it was suspending its quarterly dividend beginning in the fourth quarter of 2017 and announced a plan to cut $650 million in costs to stabilize its shaky financial condition.  Buffeted by these strong economic headwinds, Mattel's stock price steadily declined throughout 2017, falling to $14.00 per share on October 27, 2017 from $30.47 per share on January 6, 2017, or over 54%.

**Mattel's Sham Third Quarter 2017 Financial Results**

12.     On October 26, 2017, Mattel reported its financial results for the third quarter of 2017, ended September 30, 2017.  For the third quarter, the Company reported a loss of $603 million, driven by a $562 million valuation allowance on deferred tax assets.  Mattel also certified that its internal controls over financial reporting provided reasonable assurance that Mattel's financial statements were correct.  However, as defendants learned in October 2017, these statements were materially false and misleading when made.  In fact, Mattel's loss in the third quarter of 2017 was materially understated by $109 million and its internal controls were severely deficient.

13.     More specifically, as Mattel was closing its books for the third quarter of 2017, Mattel's finance and tax team was attempting to calculate a potentially significant allowance for its deferred tax assets, under the supervision of defendant PwC's lead audit partner, defendant Abrahams.  The calculating process itself was reportedly chaotic.  At first, it was determined that Mattel would not record an allowance against the value of its deferred tax assets.  Then, that determination was reversed, and it was determined that Mattel would record an allowance against the assets, thus materially reducing their value.

14.    With approximately a week left in the third quarter closing process, Mattel's finance and tax team worked around the clock and calculated a valuation allowance of approximately $175-$200 million.  But then, just days before Mattel's financial statements were due to be published, the Mattel team learned that the allowance had been miscalculated.  They apparently had incorrectly reduced the deferred tax asset by netting them against deferred tax liabilities arising from intellectual property assets (defined herein as the "HiT IP") that were classified as having an "indefinite life," which was not permissible under accounting rules.  In response, the Mattel team re-calculated the valuation allowance again – this time arriving at a much higher allowance of $562 million, which, in turn, understated Mattel's losses in the third quarter of 2017 by $109 million.

**Defendants' Scheme to Avoid Issuing a Restatement or Disclosing Any Known Material Weakness in Mattel's Financial Statements**

15.    In January 2018, an internal Mattel review of its intangible assets discovered that because of the way the HiT IP asset had been categorized, it should not have been used to reduce Mattel's third quarter 2017 losses.  Thereafter, this material error, along with material defects in Mattel's internal controls, were brought to defendants' attention.

16.    Mattel's finance and tax team reportedly believed the two material errors needed to be disclosed.  But defendants PwC and Abrahams demurred and, within days later, had concocted a scheme to conceal the material errors in Mattel's financial statements.  To this end, the classification of the HiT IP was changed from an "indefinite-lived" asset to a "finite-lived" asset retroactively as of the start of the fourth quarter of 2017, on October 1, 2017.  By executing this gambit, defendants PwC and Abrahams buried the material misstatement of Mattel's third quarter 2017 financial results and hid the severe deficiencies in Mattel's internal controls.

17.    Over time, defendants' unlawful scheme – unknown to the Mattel Board's Audit Committee – ultimately worked to Mattel's detriment.  For example, as

1    2017 and 2018 unfolded, shares of Mattel common stock traded on the market at
2    prices artificially inflated by defendants' materially false and misleading unqualified
3    audit reports.

4         18.    Ultimately, upon the public disclosure of defendants' unlawful scheme,
5    Mattel was named as primary defendant in a costly and expensive-to-defend class
6    action lawsuit for violations of the federal securities laws. *See In re Mattel, Inc. Sec.*
7    *Litig.*, No. 2:19-cv-10860 (C.D. Cal.) (the "Securities Action").  The Company is also
8    the subject of multiple federal governmental investigations into the facts surrounding
9    the misconduct complained of herein.

10   **The Truth Emerges**

11        19.    Defendants' unlawful scheme continued unabated until late 2019.  Then,
12   on October 29, 2019, Mattel disclosed that its financial statements for the periods
13   ended September 30, 2017 and December 31, 2017 "should no longer be relied upon
14   due to material misstatements."  According to the Company, an internal "investigation
15   determined that income tax expense was understated by $109 million in the third
16   quarter of 2017, and overstated by $109 million in the fourth quarter of 2017."  Mattel
17   further disclosed material weakness in its internal controls over financial reporting,
18   stating that the Company

19            has determined that certain material weaknesses existed as of December
20            31, 2018 and subsequently, and therefore the Company has concluded
21            that its internal control over financial reporting as of December 31, 2018
22            was not effective and that Management's Report on Internal Control over
23            Financial Reporting as of December 31, 2018 should also no longer be
24            relied upon.

25        20.    A few weeks later, on November 12, 2019, Mattel filed with the U.S.
26   Securities and Exchange Commission ("SEC") its restated financials in a Form 10-
27   K/A, amending the Company's previously filed 2018 Annual Report filed on Form
28   10-K (the "Restatement").  The Restatement confirmed that Mattel's previously

1  referenced financial statements "should no longer be relied upon due to material
2  misstatements," and restated its financial results as detailed above.

3      21.    The Restatement further stated that "[m]anagement has concluded that,
4  due to a material weakness related to the failure to properly design and operate
5  monitoring control activities, the Company did not maintain effective internal control
6  over financial reporting as of December 31, 2018," and that "the Company's
7  independent registered public accounting firm [defendant PwC] has restated their
8  report on the Company's internal control over financial reporting and issued an
9  adverse opinion."

10 **Plaintiff's Litigation Demand and Rejection**

11     22.    On March 3, 2020, plaintiff wrote to the Mattel Board demanding that the
12 Board act in relation to the malfeasance by defendants PwC and Abrahams, including
13 bringing legal proceedings against them.  A copy of that letter, the "Demand," is
14 attached hereto as Exhibit A.

15     23.    On April 9, 2020, plaintiff received a letter stating that, rather than
16 appointing a Special Committee to consider plaintiff's Demand, or simply filing suit
17 against defendants PwC and Abrahams, the Mattel Board had determined that
18 consideration of plaintiff's Demand should be indefinitely "defer[red]" until the
19 investigations by the SEC and U.S. Attorney's Office for the U.S. District Court for
20 the Southern District of New York ("S.D.N.Y.") and the Securities Action had been
21 resolved.  The Board responded in this fashion despite that plaintiff's Demand was
22 only directed at defendants PwC's and Abrahams' unlawful scheme, despite that the
23 Mattel Board had already investigated defendants PwC's and Abrahams' past conduct
24 and ascertained their malfeasance, and despite that neither the SEC, the U.S.
25 Attorneys' Office for the S.D.N.Y. nor the complaint filed in the Securities Action had
26 sought recovery for Mattel against defendants PwC and Abrahams.

27     24.    Through a series of additional letters and communications, plaintiff
28 repeatedly requested that Mattel provide a timeline pursuant to which its Board would

- 6 -

1  be willing to investigate these claims and respond to plaintiff's Demand, but Mattel

2  refused to do so.  The last communication received from the Board's counsel in

3  response to plaintiff's Demand, dated February 8, 2021, stated, in pertinent part, that

4  in light of the denial of the motions to dismiss filed by defendants in the Securities

5  Action – including defendant PwC – the Mattel Board had reconsidered the Board's

6  response to our client's litigation demand, though ultimately concluding once again

7  that it would not be in Mattel's best interest to even so much as respond to our client's

8  demand.

9       25.    Delaware corporation law requires a board of directors to timely accept

10  or reject a litigation demand.  A board cannot lawfully defer or otherwise ignore its

11  legal obligation to respond to a shareholder demand.  Accordingly, plaintiff brings this

12  action to protect Mattel's valuable claims against defendants PWC and Abrahams and

13  to make Mattel whole for damages and injuries suffered due to defendants' unlawful

14  scheme to cover up material misstatements in the Company's financial results and

15  material weaknesses in the Company's internal controls over financial reporting.

16                                **THE PARTIES**

17       26.    Plaintiff, the City of Pontiac Police and Fire Retirement System, is and

18  continuously has been, a shareholder of Mattel since January 2016.

19       27.    Defendant PricewaterhouseCoopers LLP ("PwC") is Mattel's

20  independent registered public accounting firm and has been since 1974.  PwC

21  conducts extensive business in California and maintains offices located at 601 S.

22  Figueroa Street, Los Angeles, California.  Defendant PwC is named as a defendant in

23  the Securities Action.

24       28.    Defendant Joshua Abrahams ("Abrahams") was defendant PwC's lead

25  audit partner on the Mattel account from 2009 to 2019.  Defendant Abrahams is

26  named as a defendant in the Securities Action.

27       29.    Nominal defendant Mattel, Inc. is a Delaware corporation with principal

28  executive offices located at 333 Continental Boulevard, El Segundo, California.

## PWC'S DUTIES AND RESPONSIBILITIES

30.    The PCAOB was established by §101 of the Sarbanes-Oxley Act of 2002 ("SOX"), to, among other things, oversee the audit of public companies that are subject to the securities laws.  The PCAOB's Auditing Standards ("AS") represent the rules and guidelines by which an audit of public companies must be planned, performed and reported on, and are a measure of the audit quality and the objectives to be achieved in an audit.  Auditors have a responsibility to their profession to comply with the standards accepted by their fellow practitioners.  The rules adopted by the SEC under §404(b) of SOX require issuers who are large, accelerated filers, like Mattel, to include in annual reports their outside auditor's attestation as to the effectiveness of the issuer's internal control over financial reporting.  This attestation must be made in accordance with the standards for attestation engagements adopted by the PCAOB.

31.    AS 2201 requires auditors to prepare reports containing an opinion on internal control over financial reporting and the company's financial statements, both of which must be included in the issuer's Annual Report on Form 10-K.  The auditor's opinion on internal control over financial reporting must opine as to whether the issuer maintained, in all material respects, effective internal control over financial reporting as of the specified date, based on the relevant control criteria.

32.    AS 2201 also requires the outside auditor report to include: (i) a statement that the audit was conducted in accordance with the standards of the PCAOB; (ii) a statement that the standards of the PCAOB require the auditor to plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects; (iii) a statement that an audit includes obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as the auditor considered

1  necessary in the circumstances; (iv) a statement that the auditor believes the audit
2  provides a reasonable basis for the auditor's opinion; and (v) the auditor's opinion on
3  whether the company maintained, in all material respects, effective internal control
4  over financial reporting, as of the specified date, based on the control criteria.

5      33.    Under PCAOB AS 2201, if an auditor discovers any material weaknesses
6  during its audit, the auditor must communicate those material weaknesses to the
7  company's audit committee and management.  Additionally, if a company's internal
8  controls have "one or more material weaknesses, the auditor must express an adverse
9  opinion on the company's internal control over financial reporting."

10      34.    Although PCAOB AS only require auditors to publish audit reports in
11  Annual Reports on Form 10-K, AS 4105 nonetheless requires auditors to
12  communicate significant deficiencies or material weaknesses to the audit committee or
13  those responsible for oversight of the company's financial reporting in a timely
14  manner and before the registrant filing its periodic report with the SEC.

15      35.    Under PCAOB AS 1015, auditors are required to exercise due
16  professional care in the planning and performance of the audit and the preparation of
17  the audit report.  Due professional care imposes a responsibility upon each
18  professional within an independent auditor's organization to observe the standards of
19  field work and reporting.

20      36.    An audit represents the highest level of assurance an external auditor can
21  provide to the benefit of potential investors with respect to the reliability of financial
22  statements when making an informed investment decision.  For this reason, the
23  independence of external auditors is important so that the auditor's opinion is
24  impartial, unbiased, and free from any undue influence or conflict of interest to
25  override the professional judgment of the auditor.  Accordingly, PCAOB AS 1005
26  requires that auditors must maintain "an independence in mental attitude" in all
27  matters related to an audit.  Additionally, AS 1005 states that "[i]ndependent auditors
28

1  should not only be independent in fact; they should avoid situations that may lead

2  outsiders to doubt their independence."

3    37.    Further, AS 1015 states that audit engagement partners should know, at a

4  minimum, the relevant professional accounting and auditing standards and should be

5  knowledgeable about the client.  The engagement partner is responsible for the

6  assignment of tasks to, and supervision of, the members of the engagement team.

7    38.    Pursuant to AS 3101, an auditor should only issue an "unqualified

8  opinion" when the auditor has "conducted an audit in accordance with the standards of

9  the [PCAOB] and concludes that the financial statements, taken as a whole, are

10  presented fairly, in all material respects, in conformity with the applicable financial

11  reporting framework."  (Footnote omitted.)  Thus, an auditor may express an

12  unqualified audit opinion only when the auditor has formed such an opinion based on

13  an audit performed in accordance with Generally Accepted Auditing Standards.

14  Accordingly, when an auditor has failed to conduct its audit in accordance with the

15  standards established by the PCAOB, it is limited to only expressing a qualified or

16  adverse opinion, disclaiming its opinion, or issuing no opinion at all.

17                          **DEFENDANTS' UNLAWFUL SCHEME**

18    39.    By 2017, Mattel – once one of the world's leading toy manufacturers –

19  had fallen on economic and financial hard times, as consumer demand continued to

20  shift toward electronics and on-line entertainment.  In the first quarter of 2017, ended

21  March 31, 2017, the Company reported an operating loss of $127 million, leading one

22  securities analyst to exclaim that "Mattel's 1Q17 results were surprisingly bad."  In

23  the second quarter of 2017, ended June 30, 2017, Mattel continued to disappoint as it

24  missed revenue, gross margin and earnings expectations.

25    40.    In September 2017, as rumors of Toys "R" Us' impending bankruptcy

26  swirled, securities analysts issued more negative reports on Mattel.  For example, on

27  September 20, 2017, Barclays reported that "[g]iven the potential for lost cash flow,

28  we believe the Toys R Us bankruptcy filing could be particularly negative for MAT."

1    Worse yet, on October 26, 2017, Mattel announced that it was suspending its quarterly

2    dividend beginning in the fourth quarter of 2017 and announced a plan to cut $650

3    million in costs to stabilize its shaky financial condition.  Yielding to these headwinds,

4    Mattel's stock price steadily declined throughout 2017, falling to $14.00 per share on

5    October 27, 2017 from $30.47 per share on January 6, 2017, or over 54%.

6    **Mattel's Sham Third Quarter 2017 Financial Results**

7          41.    On October 26, 2017, Mattel reported its financial results for the third

8    quarter of 2017, ended September 30, 2017.  For the third quarter, the Company

9    reported a loss of $603 million, driven by a $562 million valuation allowance on

10   deferred tax assets.  Mattel also certified that its internal controls over financial

11   reporting provided reasonable assurance that Mattel's financial statements were

12   correct.  However, as defendants learned in October 2017, these statements were

13   materially false and misleading when made.  In fact, Mattel's loss in the third quarter

14   of 2017 was materially understated by $109 million and its internal controls were

15   severely deficient.

16         42.    More specifically, as Mattel was closing its books for the third quarter of

17   2017, Mattel's finance and tax team was attempting to calculate a potentially

18   significant allowance for its deferred tax assets, under the supervision of defendant

19   PwC's lead audit partner, defendant Abrahams.  The calculation of this key allowance

20   was critical since it would represent a reduction in the value of one of Mattel's largest

21   assets and would impact some of the Company's most important financial metrics,

22   such as net income.

23         43.    In accounting terms, any valuation allowance would have to be deducted

24   from Mattel's income, thus reducing any profit, or increasing any losses for that

25   quarter.  Moreover, the deferred tax asset allowance would have a material impact on

26   the Company's financial results and balance sheet since Mattel carried approximately

27   $580 million in deferred tax assets on its balance sheet as of June 30, 2017.

28

44.     The calculating process itself was reportedly chaotic.  Initially, Mattel's finance and tax team determined that Mattel would not record an allowance against the value of its deferred tax assets.  Then, with approximately one week left in the closing process, the Mattel team reversed its decision and determined that it was required to record an allowance against the assets, thus materially reducing their value.

45.     Mattel's finance and tax team was then tasked with calculating a potential half-billion-dollar allowance in less than a week.  This critical tax and accounting determination would normally take several weeks to make, if not longer, yet the Mattel team was forced to do it in days.  The Mattel finance and tax team reportedly worked around the clock and calculated a valuation allowance of approximately $175-$200 million, meaning that the assets, and thus Mattel's net income, would have to be reduced by that amount.

46.     Just days before Mattel's financial statements were due to be published, the Mattel team learned that the allowance had been miscalculated.  Apparently, they had incorrectly reduced the deferred tax assets by netting them against deferred tax liabilities arising from intellectual property assets, namely HiT IP, that were classified as having an "indefinite life," which was not permitted under accounting rules.  As a result, the value of the deferred tax assets had been improperly reduced by several hundred million dollars, which, in turn, had the effect of improperly reducing the valuation allowance amount on those assets by a similar amount.

47.     In response, the Mattel team re-calculated the valuation allowance – again, without adequate time, supporting documentation, or any formal process for doing so.  This time, the Mattel team's calculation yielded a much higher allowance of $562 million, which reduced the value of Mattel's deferred tax assets – and reduced the Company's income – by hundreds of millions of dollars more.

48.     Throughout this entire process, defendants PwC and Abrahams were privy to the wild downward swings in the Company's third quarter 2017 income in the

1    days before they were to be released – first when they reversed course and decided to

2    record an allowance of approximately $175-$200 million, and then when they decided

3    to record an allowance of $562 million.  Nevertheless, with defendants PwC's and

4    Abrahams' blessing, on October 26, 2017, Mattel published the third quarter 2017

5    financial results in a Form 10-Q filed with the SEC.

6    **Defendants' Scheme to Avoid Issuing a Restatement**
     **or Disclosing Any Known Material Weakness**
7    **in Mattel's Financial Statements**

8        49.    In January 2018, as part of the closing process for the Company's 2017

9    year-end results, Mattel's finance and tax team discovered that Mattel had materially

10   understated its valuation allowance for the third quarter of 2017 and, in turn, the size

11   of its reported loss.  Specifically, Mattel's documentation showed that the $311

12   million HiT IP asset was misclassified.  Accordingly, the deferred tax liability that

13   resulted from the HiT IP, which had been used to reduce the valuation allowance for

14   the third quarter of 2017, should not have been used to reduce the allowance.  The

15   error reportedly amounted to approximately $109 million.

16       50.    Subsequently, Mattel's finance and tax team concluded that the third

17   quarter 2017 accounting misstatements detailed above had occurred and were

18   material.  As a result, the group determined that Mattel's third quarter 2017 financial

19   statements would have to be restated, and that the Company would admit to a material

20   weakness in its internal controls.

21       51.    Therefore, Mattel's finance and tax team informed defendants PwC and

22   Abrahams of their conclusions.  However, defendants PwC and Abrahams demurred

23   and, within days later, had concocted a scheme to conceal the material errors in

24   Mattel's financial statements.  To this end, the classification of the HiT IP was

25   changed from an "indefinite-lived" asset to a "finite-lived" asset retroactively as of the

26   start of the fourth quarter of 2017, on October 1, 2017.  By executing this gambit,

27   defendants PwC and Abrahams buried the material misstatement of Mattel's third

28

1  quarter 2017 financial results and hid the severe deficiencies in Mattel's internal
2  controls.

3      52.    Worse yet, despite their knowledge of the material errors Mattel's
4  financial statements, defendants deliberately concealed these adverse facts from
5  Mattel's Audit Committee.

6  **Defendants' Materially False and Misleading Statements**

7      53.    On February 27, 2018, defendant PwC issued an unqualified Audit
8  Report on Mattel's consolidated financial statements for the year ended December 31,
9  2017, including the interim periods therein (the "2017 Audit Report").

10     54.    At all relevant times during the audit of Mattel's 2017 financial
11 statements ("2017 Audit"), defendant Abrahams was PwC's lead audit partner in
12 charge of the 2017 Audit.  His responsibilities for PwC included conducting the 2017
13 Audit and preparing the 2017 Audit Report, both in accordance with the applicable
14 accounting rules.

15     55.    After completing the 2017 Audit, defendants PwC and Abrahams
16 authorized the publication of the unqualified 2017 Audit Report.  To this end, the
17 2017 Audit Report accompanied Mattel's 2017 Annual Report on Form 10-K filed
18 with the SEC on February 27, 2018.

19     56.    In the publicly filed 2017 Audit Report, defendants PwC and Abrahams
20 represented as true several facts material to the accuracy and integrity of the 2017
21 Audit.   Among other things, defendants represented that the 2017 Audit was
22 conducted in accordance with the standards of the PCAOB, and, as Mattel's auditor,
23 PwC and Abrahams had planned and performed the 2017 Audit in a manner designed
24 to obtain reasonable assurance that Mattel had maintained effective internal control
25 over financial reporting in all material respects during fiscal year 2017.

26     57.    Defendants PwC and Abrahams further represented that the processes
27 and procedures utilized for the 2017 Audit enabled them to obtain an understanding of
28 Mattel's internal controls over financial reporting.   Specifically, these auditing

- 14 -

techniques enabled defendants to: (i) assess the risk that a material weakness exists in Mattel's internal controls over financial reporting; (ii) test and evaluate the design and operating effectiveness of Mattel's internal controls based on the assessed risk; and (iii) perform such other procedures as defendants considered necessary in connection with the 2017 Audit.

58.     Moreover, defendants PwC and Abrahams represented that the 2017 Audit provides a reasonable basis for the auditor's opinions.  This included defendants' audit opinions on the accuracy of Mattel's financial statements and effectiveness of Mattel's financial controls over financial reporting, in all material respects, based on the control criteria.

59.     Defendants' specific representations as to the accuracy of Mattel's 2017 financial statements and the effectiveness of the Company's internal controls over financial reporting follow, in relevant part, below:

To the Board of Directors and Stockholders of Mattel, Inc.

***Opinions on the Financial Statements and Internal Control over Financial Reporting***

We have audited the accompanying consolidated balance sheets of Mattel, Inc. and its subsidiaries as of December 31, 2017 and 2016, and the related consolidated statements of operations, comprehensive income, cash flows, and stockholders' equity for each of the three years in the period ended December 31, 2017, including the related notes and schedule of valuation and qualifying accounts and allowances for each of the three years in the period ended December 31, 2017 appearing under Item 16 (collectively referred to as the "consolidated financial statements").  We also have audited the Company's internal control over financial reporting as of December 31, 2017, based on criteria established in *Internal Control – Integrated Framework* (2013) issued by

the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2017 and 2016, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2017 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2017, based on criteria established in *Internal Control – Integrated Framework (2013)* issued by the COSO.

**Basis for Opinions**

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to

obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

*     *     *

/s/ PricewaterhouseCoopers LLP

Los Angeles, California

February 27, 2018

60.     The statements set forth above were false and misleading when made. As a threshold matter, it was materially false and misleading for defendants PwC and Abrahams to state that PwC had conducted an "audit" of Mattel and thereby determined that its financial statements were accurate, when, during the 2017 Audit,

1  defendants PwC and Abrahams orchestrated a plan to avoid disclosing a known

2  material error.  Defendants PwC and Abrahams were informed of a material

3  misstatement issued in Mattel's third quarter financial results by no later than January

4  2018, and instead of advising Mattel's Audit Committee to issue a restatement and

5  disclose the material weaknesses that existed at the time, defendants PwC and

6  Abrahams designed and executed a plan to avoid issuing a restatement or disclosing

7  any known existing material weaknesses.  Defendants' conduct in the 2017 Audit

8  violated PCAOB standards.

9       61.     Similarly, it was materially false and misleading for defendants PwC and

10  Abrahams to state that the financial statements in the 2017 Form 10-K fairly presented

11  the financial position of the Company as of December 31, 2017 and did so "in

12  conformity with accounting principles generally accepted in the United States of

13  America."  Contrary to these statements, Mattel has now admitted that its results for

14  the third and fourth quarters of 2017 were materially misstated in violation of

15  Generally Accepted Accounting Principles ("GAAP").  Moreover, it was misleading

16  for defendants PwC and Abrahams to represent that Mattel's financial statements were

17  accurate in all material respects when PwC and Abrahams were informed of a material

18  misstatement in Mattel's third quarter financial results by January 2018 yet designed

19  and executed a plan to avoid issuing a restatement or disclosing any known existing

20  material weaknesses.

21       62.     Likewise, it was materially false and misleading for defendants PwC and

22  Abrahams to state that "the Company maintained, in all material respects, effective

23  internal control over financial reporting as of December 31, 2017, based on criteria

24  established in *Internal Control – Integrated Framework (2013)* issued by the COSO."

25  Mattel has since admitted that it "determined that there were material weaknesses in

26  its internal control over financial reporting at the time of the preparation of its

27  financial statements for the quarters ending on September 30, 2017 and December 31,

28  2017" related to "the control over the review of the income tax valuation allowance

1 analysis" and "monitoring control activities." Similarly, defendant PwC also restated

2 its audit opinion for the year ending December 31, 2018, finding that Mattel suffered a

3 material weakness in its internal controls over financial reporting as of December 31,

4 2018, that resulted in the third and fourth quarter 2017 reporting errors.

5       63. Further, it was materially false and misleading for defendants PwC and

6 Abrahams to state that PwC had conducted an "audit" of Mattel in accordance with

7 the standards of the PCAOB, and to describe the purportedly appropriate audit

8 procedures PwC employed, when defendants PwC and Abrahams devised a scheme

9 during the 2017 Audit to avoid disclosing a known material misstatement and material

10 weaknesses. In fact, defendants PwC and Abrahams were informed of a material

11 misstatement issued in Mattel's third quarter financial results by January 2018, and

12 instead of advising Mattel's Audit Committee to issue a restatement and disclose the

13 material weaknesses that existed at the time, PwC and Abrahams designed and

14 executed a plan to avoid issuing a restatement or disclosing any material weaknesses.

15 Defendants PwC's and Abrahams' conduct during the 2017 Audit violated a host of

16 PCAOB standards.

17       64. Further still, contrary to defendants' representation that PwC was

18 "independent," PwC violated the SEC and PCAOB-mandated independence rules. As

19 Mattel's Audit Committee would later report, it "concluded that certain actions in

20 specific HR-related activities by the lead audit partner of Mattel's outside auditor

21 [defendant Abrahams], namely providing recommendations on candidates for Mattel's

22 senior finance positions, was in violation of the SEC's auditor independence rules."

23 Defendant Abrahams "also provided feedback on senior finance employees." Among

24 other things, defendants violated PCAOB Rule 3526, "Communication with Audit

25 Committees Concerning Independence," when defendants PwC and Abrahams failed

26 to alert Mattel's Audit Committee of PwC's violations of SEC and PCAOB auditor

27 independence rules.

28

65.     On April 26, 2018, July 25, 2018 and October 25, 2018, Mattel filed with the SEC its quarterly reports on Form 10-Q for the periods ended March 31, 2018, June 30, 2018 and September 30, 2018, respectively.  Each of the Forms 10-Q contained essentially the same materially false and misleading evaluations of the Company's internal control over financial reporting as set forth above.

66.     On February 22, 2019, defendant PwC issued an unqualified Audit Report on Mattel's consolidated financial statements for the year ended December 31, 2018, including the interim periods therein (the "2018 Audit Report").  At all relevant times during the audit of Mattel's 2018 financial statements ("2018 Audit"), defendant Abrahams was PwC's lead audit partner in charge of the 2018 Audit.  His responsibilities for PwC included conducting the 2018 Audit and preparing the 2018 Audit Report, both in accordance with the applicable accounting rules.

67.     After completing the 2018 Audit, defendants PwC and Abrahams authorized the publication of the unqualified 2018 Audit Report.  To this end, the 2018 Audit Report accompanied Mattel's 2018 Annual Report on Form 10-K filed with the SEC on February 22, 2019.

68.     In the publicly filed 2018 Audit Report, defendants PwC and Abrahams represented as true several facts material to the accuracy and integrity of the 2018 Audit.  Among other things, defendants represented that the 2018 Audit was conducted in accordance with the standards of the PCAOB, and, as Mattel's auditor, PwC and Abrahams had planned and performed the 2018 Audit in a manner designed to obtain reasonable assurance that Mattel had maintained effective internal control over financial reporting in all material respects during fiscal year 2018.

69.     Defendants PwC and Abrahams further represented that the processes and procedures utilized for the 2018 Audit enabled them to obtain an understanding of Mattel's internal controls over financial reporting.  Specifically, these auditing techniques enabled defendants to:  (i) assess the risk that a material weakness exists in Mattel's internal controls over financial reporting; (ii) test and evaluate the design and

operating effectiveness of Mattel's internal controls based on the assessed risk; and (iii) perform such other procedures as defendants considered necessary in connection with the 2018 Audit.

70.     Moreover, defendants PwC and Abrahams represented that the 2018 Audit provides a reasonable basis for the auditor's opinions.   This included defendants' audit opinions on the accuracy of Mattel's financial statements and effectiveness of Mattel's financial controls over financial reporting, in all material respects, based on the control criteria.

71.     Defendants' specific representations as to the accuracy of Mattel's statements and the effectiveness of the Company's internal controls over financial reporting follow, in relevant part, below:

To the Board of Directors and Stockholders of Mattel, Inc.

***Opinions on the Financial Statements and Internal Control over Financial Reporting***

We have audited the accompanying consolidated balance sheets of Mattel, Inc. and its subsidiaries (the "Company") as of December 31, 2018 and 2017, and the related consolidated statements of operations, comprehensive (loss) income, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2018, including the related notes and schedule of valuation and qualifying accounts and allowances for each of the three years in the period ended December 31, 2018 appearing under Item 16 (collectively referred to as the "consolidated financial statements").   We also have audited the Company's internal control over financial reporting as of December 31, 2018, based on criteria established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2018 and 2017, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2018 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2018, based on criteria established in *Internal Control – Integrated Framework (2013)* issued by the COSO.

***Basis for Opinions***

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or

fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

\*       \*       \*

/s/ PricewaterhouseCoopers LLP

Los Angeles, California

February 22, 2019

72.     The statements set forth above were false and misleading when made. As a threshold matter, it was materially false and misleading for defendants PwC and Abrahams to state that PwC had conducted an "audit" of Mattel and thereby determined that its 2017 and 2018 financial statements were accurate, when during its 2017 Audit, defendants PwC and Abrahams devised a scheme to avoid disclosing a known material error, and PwC's audit violated PCAOB standards in numerous

1   respects.  Moreover, defendants PwC and Abrahams were informed of a material
2   misstatement issued in Mattel's third quarter financial results by January 2018, and
3   instead of advising Mattel's Audit Committee to issue a restatement and disclose the
4   material weaknesses that existed at the time, defendants PwC and Abrahams designed
5   and executed a plan to avoid issuing a restatement or disclosing any known existing
6   material weaknesses.

7          73.    Similarly, it was materially false and misleading for defendants PwC and
8   Abrahams to state that the financial statements in the 2018 Form 10-K fairly
9   represented the financial position of the Company as of December 31, 2018 and did so
10  "in conformity with accounting principles generally accepted in the United States of
11  America."  Contrary to these statements, Mattel has now admitted that its results for
12  the third and fourth quarters of 2017 were materially misstated in violation of GAAP.
13  Moreover, it was misleading for defendants PwC and Abrahams to represent that
14  Mattel's financial statements were accurate in all material respects when PwC and
15  Abrahams were informed of a material misstatement in Mattel's third quarter financial
16  results by January 2018 yet designed and executed a plan to avoid issuing a
17  restatement or disclosing any known existing material weaknesses.

18         74.    Likewise, it was materially false and misleading for defendants PwC and
19  Abrahams to state that Mattel "maintained, in all material respects, effective internal
20  control over financial reporting as of December 31, 2018, based on criteria established
21  in *Internal Control – Integrated Framework (2013)* issued by the COSO."  Mattel has
22  since admitted that it "determined that there were material weaknesses in its internal
23  control over financial reporting at the time of the preparation of its financial
24  statements for the quarters ending on September 30, 2017 and December 31, 2017"
25  related to "the control over the review of the income tax valuation allowance
26  analysis."

27         75.    Mattel has also admitted that, as of yearend 2017 and 2018, its disclosure
28  controls were severely deficient, and did not provide reasonable assurance that the

information required to be disclosed by Mattel in its SEC filings was collected, communicated, and properly reported in Mattel's SEC filings.  As Mattel would later admit, these "material weaknesses . . . existed at the time of the preparation of our financial statements for the third and fourth quarters of 2017."  As Mattel would later specify, its disclosure controls and procedures were materially deficient precisely because they did not ensure that the material errors in its third quarter 2017 financial statements were "properly assessed" or that "findings and conclusions [were] documented" or that the errors were reported to the Audit Committee or "disclosed in the 2017 10-K."  Mattel further admitted that its "material weakness related to a deficiency in monitoring control activities" "still existed as of December 31, 2018." Similarly, defendant PwC also restated its audit opinion for the year ending December 31, 2018 for the same reasons.

76.     Additionally, it was materially false and misleading for defendants PwC and Abrahams to state that PwC had conducted an "audit" of Mattel in accordance with the standards of the PCAOB, and to describe the purportedly appropriate audit procedures it employed, when defendants PwC and Abrahams devised a scheme during the 2017 Audit to avoid disclosing a known material misstatement and material weaknesses.  In fact, defendants PwC and Abrahams were informed of a material misstatement issued in Mattel's third quarter financial results by January 2018, and instead of advising Mattel's Audit Committee to issue a restatement and disclose the material weaknesses that existed at the time, defendants PwC and Abrahams designed and executed a plan to avoid issuing a restatement or disclosing any material weaknesses.  Defendants PwC's and Abrahams' conduct violated a host of PCAOB standards.

77.     Further, contrary to defendants' representation that PwC was "independent," PwC violated the SEC and PCAOB-mandated independence rules.  As Mattel's Audit Committee would later report, it "concluded that certain actions in specific HR-related activities by the lead audit partner of Mattel's outside auditor

1   [defendant Abrahams], namely providing recommendations on candidates for Mattel's

2   senior finance positions, was in violation of the SEC's auditor independence rules.  He

3   also provided feedback on senior finance employees."

4       78.     Among other things, defendants PwC and Abrahams violated PCAOB

5   Rule 3526, "Communication with Audit Committees Concerning Independence,"

6   when PwC failed to alert Mattel's Audit Committee of PwC's violations of SEC and

7   PCAOB auditor independence rules.

8   **The Truth Emerges**

9       79.     Defendants' unlawful scheme continued unabated until late 2019.  Then,

10   on October 29, 2019, Mattel revealed that its financial statements for the periods

11   ended September 30, 2017 and December 31, 2017 "should no longer be relied upon

12   due to material misstatements," and that the Company would be restating its financial

13   results in its third quarter 2017 Form 10-Q and 2017 Annual Report on Form 10-K.

14   The October 29, 2019 Form 8-K report explained that the Company's "investigation

15   determined that income tax expense was understated by $109 million in the third

16   quarter of 2017 and overstated by $109 million in the fourth quarter of 2017."

17       80.     The Form 8-K further explained that the "Audit Committee's

18   investigation found errors in publicly-filed Mattel financial statements for the last two

19   quarters of 2017, failures to properly consider and disclose such errors to the . . . Audit

20   Committee [and other Mattel officials] once they became known, and violations of

21   auditor independence rules," stating:

22           Mattel's management identified the third quarter 2017 accounting error

23           associated with its tax valuation allowance during its year-end

24           accounting closing procedures for the quarter ended December 31, 2017.

25           The error was not properly assessed nor were findings and conclusions

26           documented.  The error was not reported to Mattel's then-CEO, Margaret

27           Georgiadis, and the Audit Committee, and was also not disclosed in the

28           2017 10-K.  The investigation revealed that a confluence of one-time

1  events, management's reliance on the accounting advice sought and
2  received on the error from the lead audit engagement partner of Mattel's
3  outside auditor, and lapses in judgment by management contributed to
4  these failures.

5  81.  Mattel also revealed on October 29, 2019 that "the Company has
6  concluded that its internal control over financial reporting as of December 31, 2018
7  was not effective and that Management's Report on Internal Control over Financial
8  Reporting as of December 31, 2018 should also no longer be relied upon."
9  Additionally, Mattel disclosed that the Audit Committee determined that defendant
10 Abrahams was in violation of the SEC's auditor independence rules, stating:

11  [T]he Audit Committee's investigation and a separate investigation by
12  Mattel's outside auditor concluded that certain actions in specific HR-
13  related activities by the lead audit partner of Mattel's outside auditor,
14  namely providing recommendations on candidates for Mattel's senior
15  finance positions, was in violation of the SEC's auditor independence
16  rules.  He also provided feedback on senior finance employees.

17  82.  A few weeks later, on November 12, 2019, Mattel filed with the SEC its
18  Restatement in a Form 10-K/A, amending the Company's previously filed 2018
19  Annual Report filed on Form 10-K.  The Restatement stated that Mattel's financial
20  statements "should no longer be relied upon due to material misstatements," and
21  restated its financial results as detailed above.

22  83.  The Restatement further stated that "[m]anagement has concluded that,
23  due to a material weakness related to the failure to properly design and operate
24  monitoring control activities, the Company did not maintain effective internal control
25  over financial reporting as of December 31, 2018, and that "the Company's
26  independent registered public accounting firm [defendant PwC] has restated their
27  report on the Company's internal control over financial reporting and issued an
28  adverse opinion."

## DAMAGES TO MATTEL

84.     Mattel has suffered, and will continue to suffer, damages, injuries and losses due to defendants' misconduct.  For example, Mattel has incurred millions in costs, expenses, and fees in connection with internal and external investigations. Moreover, Mattel is now a primary named defendant the Securities Action brought by Mattel shareholders to recover damages for violations of the federal securities laws. On January 26, 2021, the U.S. District Court for the Central District of California denied the motions to dismiss the Securities Action, finding that the shareholder plaintiffs sufficiently alleged claims of securities fraud against Mattel and its co-defendants, including the named defendants in this action, defendants PwC and Abrahams.

## THE MATTEL BOARD'S DISDAIN FOR PLAINTIFF'S LITIGATION DEMAND

85.     Plaintiff incorporates ¶¶1-84.

86.     On March 3, 2020, plaintiff wrote to the Mattel Board demanding that the Board act in relation to the malfeasance by defendants PwC and Abrahams, including bringing legal proceedings against them.  *See* Exhibit A.

87.     On April 9, 2020, plaintiff received a letter stating that, rather than appointing a Special Committee to consider plaintiff's Demand, or simply filing suit against defendants PwC and Abrahams, the Mattel Board had determined that consideration of plaintiff's Demand should be indefinitely "defer[red]" until the investigations by the SEC and U.S. Attorney's Office for the S.D.N.Y. and the Securities Action had been resolved.  The Board responded in this fashion despite that plaintiff's Demand was only directed at defendants PwC's and Abrahams' unlawful scheme, despite that the Mattel Board had already investigated defendants PwC's and Abrahams' past conduct and ascertained their malfeasance, and despite that neither the SEC, the U.S. Attorneys' Office for the S.D.N.Y. nor the complaint filed in the

1  Securities Action had sought recovery for Mattel against defendants PwC and

2  Abrahams.

3       88.    Through a series of additional letters and communications, plaintiff

4  repeatedly requested that Mattel provide a timeline pursuant to which its Board would

5  be willing to investigate these claims and respond to plaintiff's Demand, but Mattel

6  refused to do so.  The last communication received from the Board's counsel in

7  response to plaintiff's Demand, dated February 8, 2021, stated, in pertinent part, that

8  in light of the denial of the motions to dismiss filed by defendants in the Securities

9  Action – including defendant PwC – the Mattel Board had reconsidered the Board's

10  response to our client's litigation demand, though ultimately concluding once again

11  that it would not be in Mattel's best interest to even so much as respond to our client's

12  demand.

13       89.    Delaware corporation law requires a board of directors to timely accept

14  or reject a litigation demand.  A board cannot lawfully defer or otherwise ignore its

15  legal obligation to respond to a shareholder demand.  Accordingly, plaintiff brings this

16  action to protect Mattel's valuable claims against defendants PWC and Abrahams and

17  to make Mattel whole for damages and injuries suffered due to defendants' unlawful

18  scheme to cover up material misstatements in the Company's financial results and

19  material weaknesses in the Company's internal controls over financial reporting.

20  **COUNT I**

21  **(Against Defendants PwC and Abrahams**
**for Violations of §§10(b) and 21D of the Exchange Act)**

22

23       90.    Plaintiff incorporates ¶¶1-89.

24       91.    Mattel is named as a defendant in the Securities Action, which asserts

25  claims under the federal securities laws for, among other things, violation of §10(b) of

26  the Exchange Act.  The Company's liability in the Securities Action will arise, in

27  whole or in part, from the intentional, knowing, or reckless acts or omissions of

28  defendants PwC and/or Abrahams, as alleged herein.  The Company is entitled to

1  receive contribution from those defendants in connection with the Securities Action

2  against the Company.

3       92.    Defendants PwC and Abrahams had the power and/or ability to, and did,

4  directly or indirectly control or influence PwC's audit reports on the Company's

5  financial statements and results and disclosures about the Company's internal controls

6  over financial reporting and had the power and/or ability directly or indirectly to

7  control or influence the specific statements and conduct that has exposed Mattel to

8  liability for violations of the federal securities laws.

9       93.    Accordingly, Mattel is entitled to all appropriate contribution from

10 defendants PwC and Abrahams under §§10(b) and 21D of the Exchange Act, 15

11 U.S.C. §§78j(b) and 78u-4, which govern the application of any private right of action

12 for contribution asserted pursuant to the Exchange Act.

### COUNT II

**(Against Defendants PwC and Abrahams
for Professional Negligence and Accounting Malpractice)**

94.    Plaintiff incorporates ¶¶1-89.

95.    Defendants PwC and Abrahams issued, and/or caused to be issued,
unqualified opinions on Mattel's financial statements, signifying that they had audited
such statements and found them to be compliant with GAAP.  PwC and Abrahams
allowed Mattel to disseminate these unqualified opinions publicly in connection with
their filing of Mattel's Annual Reports on Form 10-K.

96.    A reasonably competent auditor would conduct its audits in compliance
with GAAP and PCAOB AS, as described above.  Such audits would be designed to
detect improper accounting of deferred tax asset valuation allowances.  Defendants
PwC and Abrahams were required to act with reasonable care, diligence and
competence, and to exercise independent thought and judgment in acting as an
independent auditor.

97.   Defendants PwC and Abrahams failed to meet the standard of a reasonably competent auditor in their audits of Mattel's financial statements filed with the SEC.  Defendants PwC and Abrahams rendered unqualified opinions despite their awareness, or recklessness in not being aware, that they were false when issued. Contrary to their public representations, defendants' audits of Mattel failed utterly to comply with PCAOB AS and Generally Accepted Auditing Standards, and Mattel's financial statements violated GAAP as well as SEC rules.

98.   While performing their audits, defendants PwC and Abrahams received information demonstrating that, as set forth in detail herein, Mattel's financial statements were fraught with improprieties.

99.   As a result of defendants' improper actions and/or inactions, defendants PwC and Abrahams knew, were grossly negligent or were negligent in not knowing the material undisclosed adverse information about Mattel's financial statements in the Company's 2017 and 2018 Annual Reports on Form 10-K.

100.  Foreseeably, Mattel relied on the services and statements provided by defendants PwC and Abrahams.  As a direct and proximate result, Mattel was damaged thereby.

**COUNT III**

**(Against Defendants PwC and Abrahams
for Gross Negligence)**

101.  Plaintiff incorporates ¶¶1-89.

102.  The misconduct of defendants PwC and Abrahams detailed herein above constitutes gross negligence.

103.  As a direct and proximate result of defendants PwC's and Abrahams' gross negligence, Mattel sustained significant damages in an amount to be proven at trial.

## COUNT IV

**(Against Defendants PwC and Abrahams
for Negligent Misrepresentation)**

104.   Plaintiff incorporates ¶¶1-89.

105.   Defendants' audit reports and/or opinions misrepresented that Mattel's financial statements were fairly stated in all material respects and that effective internal controls over financial reporting were in place when, in fact, the financial statements were grossly misstated and the internal controls were deficient.

106.   For the reasons set forth above, defendants PwC's and Abrahams' misrepresentations were negligent and grossly negligent.   Defendants PwC and Abrahams knew that Mattel and its investors would rely on their audit reports and opinions.   In justifiable reliance on the audit reports and opinions, Mattel was deprived of the opportunity to take steps that it would have taken to mitigate losses if the audit reports and opinions had been accurate and prepared in conformity with applicable professional standards.   Defendants PwC's and Abrahams' negligent and grossly negligent misrepresentations proximately caused significant damage to Mattel in an amount to be proven at trial.

## COUNT V

**(Against Defendants PwC and Abrahams
for Unjust Enrichment)**

107.   Plaintiff incorporates ¶¶1-89.

108.   By their wrongful acts and omissions, defendants PwC and Abrahams were unjustly enriched at the expense of and to the detriment of Mattel.   Over the years, defendants PwC, together with its partners, including defendant Abrahams, have received substantial payments from Mattel for audit and audit-related services.

109.   Plaintiff, as a representative of the Company, seeks restitution from the defendants PwC and Abrahams, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by defendants, and each of them, because of their wrongful conduct detailed herein.

## COUNT VI

### (Against Defendants PwC and Abrahams
for Contribution)

110.   Plaintiff incorporates ¶¶1-89.

111.   Mattel is named as a defendant in the Securities Action, and its liability arises, in whole or in part, from the knowing, grossly negligent, and/or reckless acts or omissions of defendants PwC and Abrahams alleged herein.

112.   Accordingly, Mattel is entitled to all appropriate contribution and indemnification from defendants PwC and Abrahams under state law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.   Awarding money damages against all defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure defendants do not participate therein or benefit thereby;

B.   Directing all defendants to account for all damages caused by them and all profits they have obtained as a result of their unlawful conduct, including all the payments of all fees and imposing a constructive trust thereon;

C.   Return of any and all fees paid to PwC for the audits challenged herein;

D.   Awarding punitive damages;

E.   Awarding costs and disbursements of this action, including reasonable attorneys', accountants' and experts' fees; and

F.   Granting such other and further relief as this Court may deem just and proper.

1

## JURY DEMAND

2          Plaintiff demands a trial by jury.

3    DATED:  October 27, 2021                    ROBBINS GELLER RUDMAN
                                                   & DOWD LLP
4                                                TRAVIS E. DOWNS III (148274)
                                                 BENNY C. GOODMAN III (211302)
5                                                ERIK W. LUEDEKE (249211)

6

7                                                      s/ Travis E. Downs III
                                                 ─────────────────────────────
8                                                     TRAVIS E. DOWNS III

9                                                655 West Broadway, Suite 1900
                                                 San Diego, CA  92101
10                                               Telephone:  619/231-1058
                                                 619/231-7423 (fax)

11                                               ROBBINS GELLER RUDMAN
                                                   & DOWD LLP
12                                               MARY K. BLASY
                                                 58 South Service Road, Suite 200
13                                               Melville, NY  11747
                                                 Telephone:  631/367-7100
14                                               631/367-1173 (fax)

15                                               ASHERKELLY
                                                 MATTHEW I. HENZI
16                                               25800 Northwestern Highway, Suite 1100
                                                 Southfield, MI  48075
17                                               Telephone:  248/746-2710
                                                 248/747-2809 (fax)

18
                                                 Attorneys for Plaintiff
19

20

21

22

23

24

25

26

27

28

**VERIFICATION**

I, TRAVIS E. DOWNS III, hereby declare the following:

1.      I am one of the attorneys for plaintiff City of Pontiac Police and Fire Retirement System ("City of Pontiac").  This verification is based upon my personal knowledge, and I could competently testify to the statements contained herein if called upon as a witness.

2.      I have knowledge of the facts alleged in the Verified Shareholder Derivative Complaint for Violations of the Federal Securities Laws, Professional Malpractice, Gross Negligence, Unjust Enrichment and Contribution, and I believe them to be true to the best of my information and belief.

3.      I make this verification because plaintiff City of Pontiac is absent from the County of San Diego where I maintain my office.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 27th day of October, 2021, at San Diego, California.


                                        s/ Travis E. Downs III
                              _____
                                   TRAVIS E. DOWNS III

# EXHIBIT A

## Robbins Geller
## Rudman & Dowd LLP

| | | |
|---|---|---|
| Boca Raton | Melville | San Diego |
| Chicago | Nashville | San Francisco |
| Manhattan | Philadelphia | Washington, D.C. |

Mary K. Blasy
mblasy@rgrdlaw.com

March 3, 2020

<u>VIA OVERNIGHT DELIVERY</u>

Mattel, Inc. Board of Directors
c/o Ynon Kreiz, Chairman
Mattel, Inc.
333 Continental Boulevard
El Segundo, CA 90245-5012

Re: *Demand to Commence Investigation and Litigation*

Dear Board Members:

We write on behalf of the City of Pontiac Police and Fire Retirement System ("Pontiac") Client, which is a shareholder of Mattel, Inc. ("Mattel" or the "Company"). This letter serves as a formal demand that the Mattel Board of Directors immediately investigate and commence legal action for compensatory, equitable, remedial and other relief against PricewaterhouseCoopers LLP ("PwC") and its partner Joshua Abrahams ("Abrahams") for negligence, breach of contract, professional malpractice and unjust enrichment.

By way of background, in light of the critical importance of auditor independence, the Sarbanes-Oxley Act of 2002 mandated rotation after five years of the principal engagement partner overseeing a corporate client's audits. Yet PwC has served as Mattel's outside audit firm consistently since 1974.

Mattel's shareholders have been asked to, and have, ratified the reengagement of PwC as Mattel's outside auditor for decades. And PwC had been handsomely rewarded as a result of this engagement, having been paid over $9.4 million per year for fiscal years 2017 and 2018 alone. However, shareholder approval was obtained only through subterfuge over the past couple of years because it was concealed from shareholders that PwC had been actively deceiving them as to Mattel's actual financial results, the soundness of its financial reporting and internal controls; and that its financial statements were being prepared in compliance with Generally Accepted Accounting Principles ("GAAP") and that PwC's audits were being conducted in compliance with Generally Accepted Auditing Standards ("GAAS").

The U.S. Securities and Exchange Commission ("SEC") has repeatedly emphasized that "maintaining the independence of auditors is crucial to the credibility of financial reporting." As such, auditors and audit committees constantly – both before and during an engagement – must be

Robbins Geller
Rudman & Dowd LLP

Mattel, Inc. Board of Directors
March 3, 2020
Page 2

vigilant against impairment of their independence and devote substantial resources to verifying and maintaining that independence. The potential consequences to an issuer, such as Mattel, of violating auditor independence standards are severe. Violations may render previously filed financial statements noncompliant with the Securities Exchange Act of 1934 and related SEC rules, or they could adversely affect the timely filing of financial statements. A violation can also put an issuer in default on its financial covenants with lenders and can raise its costs of raising capital.

In early 2018, certain Mattel finance executives discovered errors in the prior year's accounting that had reduced its previously reported loss for the third quarter 2019 ("3Q19"), likely indicated that its internal controls were deficient, and would have been an embarrassment both to Mattel's finance executives and PwC and its audit partner, Abrahams. The accounting misstatement arose out of Mattel's ownership of Thomas & Friends, an animated children's show about talking trains. The relevant members of Mattel's finance team discussed fixing the problem and restating earnings, with the expectation that Mattel would have to admit to shortcomings in its accounting and reporting procedures.

As has since been reported by the *Wall Street Journal* citing Brett Whitaker ("Whitaker"), who was Mattel's director of tax reporting at that time, after the issue was reported internally, Mattel's heads of accounting and internal control believed it was a material error that needed to be disclosed. However, Whitaker says that PwC took a different view, stating that: "A PwC partner told me that they were looking for a way to say this isn't a material weakness."

According to Whitaker, "[i]nstead, senior finance executives and Mattel's auditor, PricewaterhouseCoopers, decided to change the accounting treatment of the Thomas asset, effectively burying the problem." They reportedly agreed to withhold the information from Mattel's then-CEOs as well. According to Whitaker: "It was known within Mattel that if we took this approach, at worst we might get a slap on the wrist from the Securities and Exchange Commission," "[b]ut if the company disclosed a material weakness, a senior executive said to me it would be 'the kiss of death.'" Instead, Mattel, counseled by PwC, decided to reclassify the Thomas asset in a way that would have made its treatment in the third quarter 2017 ("3Q17") correct, and recorded a tax expense in the fourth quarter 2017 ("4Q17") that offset the earlier misstatement. Whitaker says that Mattel and PwC agreed that no restatement was needed.

Whitaker resigned his positions with Mattel in March 2019.

On August 2, 2019, PwC received a whistleblower complaint alleging falsification of Mattel's historical financial statements, auditor independence rule violations and other possible misconduct. The receipt of the whistleblower letter, disclosed by Mattel on August 8, 2019, abruptly nixed the Company's efforts then underway to raise much needed capital through a debt offering at the last minute.

Robbins Geller
Rudman & Dowd LLP

Mattel, Inc. Board of Directors
March 3, 2020
Page 3

In response to the whistleblower complaint, the Audit Committee of the Mattel Board of Directors, together with independent counsel from O'Melveny & Myers LLP and forensic accountants from FTI Consulting, undertook an investigation into potential past accounting errors in historical periods and whether Mattel's outside auditor was independent. PwC purportedly conducted its own investigation and purportedly informed the Audit Committee that it had shared all relevant information with the Audit Committee.

According to the *Wall Street Journal*, "Mr. Whitaker said he declined an invitation to give evidence to the internal investigation, adding that he told the company he had already provided the relevant information before he left." Whitaker, who said he isn't the August whistleblower, said that when Mattel didn't restate earnings or admit to accounting problems in 2018, he believed it was a cover-up, stating: "My team was dumbfounded by it." According to Whitaker, PwC was involved in the decision not to disclose the "error," which the firm would have had to admit it missed. According to Whitaker: a PwC tax partner was "walking down the hall, high-fiving people, after this decision was made."

As disclosed on October 29, 2019, the Mattel Board's Audit Committee investigation determined that:

- Mattel's publicly-filed financial statements for the last two quarters of 2017 had contained "errors" that, due to an error calculating its tax valuation allowance, effectively understated Mattel's income tax expense by $109 million in the 3Q17 and overstated it by $109 million in the 4Q17;

- As a result of these "errors," Mattel's previously reported net loss of $603.3 million for the 3Q17 was understated by $109 million and the correct reported net loss for the 3Q17 ended September 30, 2017 should have been a net loss of $712.3 million;

- While a change in accounting for an intangible asset in the 4Q17 had resulted in an effective correction of the "error" for the fiscal 2017 annual results, the tax expense remained uncorrected in the 3Q17 quarterly report filed with the SEC on Form 10-Q and was therefore overstated in the interim period ended December 31, 2017, and as a result, Mattel's previously reported loss of $281.3 million for the 4Q17 ended December 31, 2017 should have been reported as a net loss of $172.3 million;

- Mattel must now restate the Company's financial results for the 3Q17 and 4Q17 and certain related information;

Robbins Geller
Rudman & Dowd LLP

Mattel, Inc. Board of Directors
March 3, 2020
Page 4

- Mattel has also determined that in addition to the restatement of financial statements referred to above, Mattel will "revise 2019 and prior periods for certain other . . . out-of-period adjustments" that "are unrelated to the Letter or issues investigated by the Audit Committee";

- Certain members of Mattel's management had identified the 3Q17 accounting "error" associated with the tax valuation allowance during the year-end accounting closing procedures for fiscal 2017, but the "error was not properly assessed nor were findings and conclusions documented";

- Mattel's "management's reliance on the accounting advice sought and received on the error from the lead audit engagement partner of" PwC, Abrahams, had "contributed to these failures";

- Mattel had been operating with material weaknesses in its internal control over financial reporting at the time of the preparation of its financial statements for the 3Q17 and 4Q17, rendering PwC's attestation as that false and misleading as well;

- PwC had failed to properly consider and disclose the "errors" to Mattel's then-Chief Executive Officer ("CEO"), Margaret Georgiadis, and the Audit Committee once they became known, and, as a result, they were not disclosed in Mattel's fiscal 2017 annual financial report filed with the SEC on Form 10-K; and

- PwC had violated the auditor independence rules by recommending candidates for Mattel's senior finance positions.

Moreover, in December 2019, the SEC subpoenaed records from Mattel concerning its investigation into the accounting errors discussed above. The U.S. Attorney for the Southern District of New York reportedly has also opened an investigation into the Company's recent restatement and the departure of the Company's former CFO.

Mattel has been, and will continue to suffer severe damages, injuries and losses. Accordingly, Pontiac demands that the Mattel Board of Directors commence legal action against PwC and Abrahams for negligence, breach of contract, professional malpractice and unjust enrichment. The legal action must be tailored to ensure that any legal responsibility for this misconduct is borne by the responsible parties, and not Mattel. The action shall also seek disgorgement of the millions of dollars in audit fees PwC was paid, the costs of Mattel's ongoing investigation and restatement, any fines or penalties Mattel may later be assessed as a result of the misconduct, and any increased costs of capital Mattel has experienced as a result of the misconduct,

**Robbins Geller**
**Rudman & Dowd** LLP

Mattel, Inc. Board of Directors
March 3, 2020
Page 5

including all costs incurred as a result of having to cancel the debt capital raise in August 2019 and any incremental costs/expenses it incurs doing the debt capital raise at a later date. Damages shall also be sought for the impairment of Mattel's reputation.

In making the foregoing demands, Pontiac does not concede that the Board of Directors or any member thereof is independent or competent to consider these demands.

We appreciate your prompt attention to this serious matter. Should you have any requests, questions or concerns, please do not hesitate to contact us.

Sincerely,

Mary K. Blasy

**From:** UPS Quantum View
**To:** Debbie Hayes
**Subject:** UPS Delivery Notification, Tracking Number 1Z06117X0193082174
**Date:** Wednesday, March 4, 2020 9:53:20 AM



## Your package has been delivered.

**Delivery Date:**   Wednesday, 03/04/2020
**Delivery Time:**   09:40 AM

At the request of ROBBINS GELLER RUDMAN & DOWD this notice alerts you that the status of the shipment listed below has changed.

# Shipment Detail

| | |
|---|---|
| **Tracking Number:** | **1Z06117X0193082174** |
| **Ship To:** | c/o Ynon Kreiz, Chairman<br>Mattel, Inc. Board of Directors<br>333 CONTINENTAL BLVD<br>EL SEGUNDO, CA 90245<br>US |
| **UPS Service:** | UPS NEXT DAY AIR |
| **Number of Packages:** | 1 |
| **Shipment Type:** | Letter |
| **Delivery Location:** | RECEIVER |
| | HUY |
| **Reference Number 1:** | 000888-00007 |
| **Reference Number 2:** | 90587 |
| **Reference Number 3:** | Mattel, Inc. |



 Download the UPS mobile app

© 2020 United Parcel Service of America, Inc. UPS, the UPS brandmark, and the color brown are trademarks of United Parcel Service of America, Inc. All rights reserved.

All trademarks, trade names, or service marks that appear in connection with UPS's services are the property of their respective owners.

Please do not reply directly to this email. UPS will not receive any reply message.

**Review the UPS Privacy Notice**

**For Questions, Visit Our Help and Support Center**

